UNITED STATES of America ex rel. William DAVIS, Petitioner,

v.

Hon. Daniel McMANN, Warden of Clinton Prison, Dannemora, New York, Respondent.

No. 65–CV–6.

United States District Court
N. D. New York.

March 18, 1966.

Gretchen White Oberman, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., of New York, Albany, N. Y., for respondent; Joseph R. Castellani, Thomas LaRosa, Asst. Attys. Gen., of counsel.

JAMES T. FOLEY, Chief Judge.

This habeas corpus proceeding, in my opinion, involves a claim of substance. It compels an unpleasant task in that the review to a great degree concerns discretionary acts by a State trial judge on the scene in a situation that every trial judge, state or federal, knows is perplexing, troublesome and upsetting even to the most placid. (United States ex rel. DiBlasi v. McMann (NDNY), 236 F. Supp. 592; aff'd 2 Cir., 348 F.2d 12). The important question here is whether under the prevailing circumstances at the time of trial on serious charges this petitioner, against his wishes, was forced to trial without any counsel retained or assigned, when he insisted throughout he wanted a lawyer, in violation of the Sixth Amendment, and whether the trial itself on a multiple indictment was so unfair under the circumstances of self-representation as to violate the due process clause of the Fourteenth Amendment. In my judgment, and it is recognized as drastic intrusion, the State trial record and the federal presentation convince me that the State action and the resulting conviction was violative of federal constitutional right and liberty. (Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770).

We have a situation by reason of unusually tempestuous events that indicate to me that prejudice to the legitimate interests of the petitioner overbalanced the important need for proper judicial administration and its protection from cunning maneuver to disrupt it. (DiBlasi, supra, 348 F.2d 12, 15). Justice Cardozo said competing considerations must be weighed in such scales as are available. (Hoadley v. Hoadley, 244 N.Y. 424, 434, 155 N.E. 728, 51 A.L.R. 844).

There is available the state trial record made in Brooklyn in October, 1962. The present petition is supported by an affidavit of Mrs. Ethel W. Mott, the retained lawyer for the petitioner, who participated in the trial until eleven jurors were selected, the affidavit of a lawyer of the Legal Aid Society, Mr. Thomas Brett, whose part at the trial scene for a very short period of time will be discussed later, and the affidavit of Edward Davis, the petitioner's brother. Depositions of Judge Leibowitz and Assistant District Attorney Selzer were taken in Brooklyn in the Judge's Chambers in April, 1965, and at the request of the attorney for the petitioner the brother, Edward Davis, testified before me at hearing held in Albany on June 21, 1965. This description of effort should point up again the difficulty this District Court has to compile a satisfactory record when a conviction is rendered far away in the City of Brooklyn or New York. The awkwardness should be apparent to all of this long distance review that is sought to be overcome by H.R. 7618, legislation introduced in the Congress and approved by the Judicial Conference of the United States to allow coordinate jurisdiction for the filing of these state prisoner writs in the federal district of sentence as well as that of confinement, and permit discretionary transfer for hearing and determination when necessary in furtherance of justice.

The petitioner was convicted on October 24, 1962 by a jury, of robbery first

degree, grand larceny first degree, and assault in the second degree. Judge Leibowitz, for some reason not explained in the record, did not sentence until February 14, 1963, the sentence being imprisonment for a term of thirty to sixty years as a second felony offender. A copy of the sentencing minutes separate from the trial record furnished shall be filed with the Clerk of this Court. In a short memorandum the Appellate Division, Second Department, 21 A.D.2d 964, 252 N.Y.S.2d 405, unanimously affirmed the judgment of conviction and concluded without reference to any detail that the Trial Court offered to assign counsel, which the defendant refused to accept, and although the trial proceeded with defendant acting as his own counsel, under the circumstances defendant waived his right to counsel and was not deprived of a fair trial. The cases cited in support of the ruling are: People v. Gordon, 8 A.D.2d 835, 190 N.Y.S.2d 625; aff'd 7 N.Y.2d 942, 198 N.Y.S.2d 314, 165 N.E.2d 877; cert. den. 363 U.S. 853, 80 S.Ct. 1634, 4 L.Ed.2d 1735; People v. Bai, 7 N.Y.2d 152, 196 N.Y.S.2d 87, 164 N.E.2d 387. Judge Fuld of the New York Court of Appeals denied leave to appeal without comment.

I shall refer to some of the incidents in the trial record that cause disagreement on my part with these rulings. The case was moved for trial on October 16, 1962, at a Trial Part of the Supreme Court, Kings County, over which Judge Leibowitz was presiding. The petitioner-defendant had been confined since April, unable to post the substantial bail required, and was so confined at the time of and during the trial. On this first day when the case was moved for trial, he was represented by Mrs. Ethel W. Mott, an attorney, who had been his retained attorney for several months. Mrs. Mott, after some discussion in open court, was denied the adjournment she requested, and was directed to draw a jury that afternoon and start the trial the next day. Then, and it is in the record, a conference took place in the Judge's Chambers at the request of Mrs. Mott, concerning a plea of guilty. Present were the Judge, the Assistant District Attorney, Mrs. Mott and the defendant. The record discloses that at this time the District Attorney was willing to accept a plea to Robbery third degree in satisfaction of the indictment, and the Judge went further and said he would treat it as a plea to attempted Robbery third degree. (R. 6–7). This portion of the record gives some indication the Judge knew the criminal record of the defendant at this time when the plea was discussed, and this knowledge is verified in the deposition of the Judge later. (Dep. pg. 21). The petitioner-defendant was adamant at this conference that he would only talk to his lawyer about a misdemeanor plea. (R. 8). These are not unusual events in themselves, because I suppose criminal courts in the metropolitan areas with their massive burden have to discuss pleas in this manner. However, it is a paradox that after a two-day trial this same petitioner-defendant to whom this greatly reduced plea was offered by the Judge himself, was described at the sentence by the Judge after the trial as a no-good rotter, a confirmed gunman and such a menace to society that imprisonment "for a good long time" was called for. (S.M. 15).

When the jury examination was commenced on October 16, the voir dire examination of the prospective jurors, as is the custom of many courts including this one, was not recorded except when objection was made. The incident of significance in the record is the objection of Mrs. Mott that she had exception to Juror 10 because he had a daughter who was an Assistant District Attorney. The Judge reserved upon the question whether this was a proper challenge for cause until the next morning so the law could be searched. Mrs. Mott, during this interrogation before the jury was complete and sworn, had used the twenty peremptory challenges. Despite the absence of details in the trial record it does seem clearly evident that this first and beginning day of jury selection was a stormy one. The following morning the Judge allowed a

peremptory challenge to Juror 10, and excused another juror at the latter's request.

With ten jurors in the box as acceptable, here is what took place the second day that enlightens as to the day before:

THE COURT: You said the family want you to withdraw from the case, and I don't care about the family. I have ruled. Take your exception and please sit down.

\*    \*    \*    \*    \*    \*

MRS. MOTT: I want to withdraw on account of what happened yesterday.

THE COURT: I don't care what happened yesterday.

MRS. MOTT: Have you forgotten what happened yesterday?

THE COURT: Please be seated.

THE DEFENDANT: Your Honor, I don't wish to retain this woman any further. \*   \*   \*

MRS. MOTT: Your Honor, I have been fired. \*   \*   \* Your Honor, please talk soft. \*   \*   \*
(R. 13–14).

Judge Leibowitz, in his explanation in 1965 of this particular portion of the testimony, said "nothing had happened yesterday" except her impertinent and insulting demeanor. (Dep. pg. 25). In her affidavit supporting the present application, Mrs. Mott states: "During the course of the day I was subjected to continual harassment and abuse by Judge Leibowitz in the presence of the jury and of my client." In his deposition Assistant District Attorney Selzer says Mrs. Mott was very disrespectful to the Court on this first day and very aggressive in an attempt to get the case away from Judge Leibowitz. (Dep. pg. 7). On October 17th the jury was completed by the selection of two additional jurors and one alternate in what seems peremptory fashion, apparently without any participation by the defendant or Mrs. Mott in questioning. Mrs. Mott had asked to withdraw, been refused and was sitting now silently alongside the defendant by

direction of the Court. There is further colloquy in the record, indicative of friction and hostility between the Court and the defense lawyer at this time and then, shortly after the Assistant District Attorney had started his opening, the Judge interrupted him, excused the jury and recessed the trial until the afternoon. After the jury left the Court and Mrs. Mott engaged again in verbal combat:

THE COURT: Mrs. Mott, I would like to ask you some questions. This morning when you came to Court were you in conference with the family?

MRS. MOTT: That's right. I talked to the family last night.

THE COURT: I have had hell on earth with you, as other Judges have.

MRS. MOTT: \*   \*   \* I need an attorney myself.

THE COURT: Just did you have a conference with the family.

MRS. MOTT: \*   \*   \* I just can't answer. I can't go on with this. I am on the verge of collapse.

THE COURT: Now you can leave. The point that I make before you go
\*    \*    \*

MRS. MOTT: I don't want to hear.

THE COURT: Let the record show that counsel is running out of the courtroom."

(R. 20–22; see also Dep. pg. 26)

No matter where the fault is placed, it is evident the springboard to this trial, the jury selection days, were immersed in unpleasantries and friction to a degree not ordinarily present in the most heated atmosphere of actual trial. I think this impassioned prelude is not in accord with the true administration of and best interests of justice. These two encounters may have taken place outside the presence of the jury, although the record is not clear in that regard. Still, their effect must have permeated the courtroom area and made a jury of laymen aware of extraordinary happenings. Surely the fear of the defendant and his family, no matter their acquaintance with criminal pro-

cedures and tricks, if such were true, cannot be minimized. One thing was certain: their retained lawyer was off to a bad start and not getting along well with the Judge. The turbulence of the first day is easily inferred and pandemonium certainly reigned the morning of the next for a while. Circumstances would impel justifiably the average person to have second thoughts about their counsel, and after Mrs. Mott advised the Court that the family of Davis had requested her to withdraw from the case, and such request was refused, Davis minced no words: "I do not wish to retain this woman as my counsel any further. She is fired." (R. 12, 17–18).

Throughout the record and in his deposition of 1965, Judge Leibowitz expressed and reaffirmed strong convictions that the attempt of Mrs. Mott to withdraw and the defendant to discharge her after the ten jurors had been examined was based upon a family scheme to delay the case beyond the October trial part at which he was scheduled to preside. At the trial the comment was—and the others are in the same vein: "If your game is to get this case out of Judge Leibowitz' hands, you are barking up the wrong tree." (R. 26).

After Mrs. Mott left the courtroom there are occurrences next to consider. The defendant was ordered remanded and then asked if he had money to retain a lawyer. He said: "My family will get me a lawyer. I will get a lawyer of my own choosing." (R. 23). The Judge directed the family to get a lawyer by the afternoon, and he would give the lawyer a postponement. Then the brother, Edward Davis, who had gone out of the courtroom with Mrs. Mott, was brought before the bench and questioned as to his ability to retain a lawyer. He said he would try to raise the money to retain a lawyer, and the Judge gave him until the following morning. Edward Davis protested, said he was a policeman (Navy) and worked from four to twelve, and could not find "a good, reputable lawyer in one day", but the Judge stood on the direction, with the warning that otherwise the defendant would have to proceed alone. (R. 24–27). When the jury returned they were excused until the next day, Thursday, October 18th. That morning the brother, again before the bench, explained he was unable to retain a lawyer. The case was then adjourned to Monday, October 22nd. The brother informed the Judge in open court he had "contacted several lawyers but their fee is too high and I can't get one at this time." The Court offered to assign one but the brother still insisted the family could afford their own lawyer. (R. 30–31). It was then Thomas Brett of the Legal Aid Society became involved. The Judge reviewed at length the background of the case in the Court up to that time for Mr. Brett in the presence of the defendant. (R. 31–34). The direction by the Court then was:

"  *   *   *   You may sit down next to the defendant, Mr. Brett, so that he may consult you at any time and get your advice. If you want an hour's adjournment to familiarize yourself with the case, I will accede to that request, but the defendant will not be permitted to impede the wheels of justice with these maneuvers.  *   *. Do you want Mr. Brett to represent you?

DEFENDANT: No, Sir.

THE COURT: You may conduct your defense yourself. All right, Mr. Brett, the defendant refuses your aid."

(R. 34–35).

The aftermath of this incident is that in the affidavit supporting the present petition Attorney Brett says he would not have accepted the assignment under the one-hour condition in view of the serious charges, and if additional time had been granted he would have asked for a mistrial, feeling "that what had transpired previously was most highly prejudicial to the defendant." I would think most lawyers would feel the same and would not want to pick up with a jury examined by others. In his deposition Judge Leibowitz states if Mr. Brett had been per-

mitted by the defendant to be his attorney, he would have granted a reasonable continuance, and I have no doubt he would have. (Dep. pg. 45). However, the record must be reviewed as it is, and it seems incongruous to presume from something not in it that a defendant or a lawyer should know something is in the mind of the Judge other than what he said. Situations of this kind are a perplexing tug-of-war for every judge in criminal trials. Judges fill and backfill, pressure and counter-pressure, use diplomacy and sternness alternately, striving to insure adequate representation of a defendant before the exercise of the ultimate weapon to direct that an untrained layman try his own case. This—under our system and in this modern day—should be accorded at all costs. One can well appreciate the sense of frustration engendered and the suspicion that may justifiably be in the mind of the Judge that planned jockeying behind the scenes was going on. However, the stakes are high and Judges must strive to go beyond the limits of ordinary patience, and even carry to an extreme, at times, an attitude of forbearance. Courts sit to determine questions on stormy as well as on calm days. (Douglas, We the Judges, pg. 64).

Judge Leibowitz did extend himself again, and the case was adjourned to Wednesday, October 24, 1962, with the caution again to Edward Davis that this two-day adjournment was the last chance to obtain a lawyer. There is no further mention in the affidavit of subsequent appearance of the brother, Edward Davis, in or out of the courtroom or of any discussion thereafter by the brother with the Judge.

On October 24, 1962, the trial began routinely, with the defendant acting as his own lawyer throughout. The case was tried in one day. Of course, I do now have the affidavit of the brother and his sworn testimony as to his efforts to obtain lawyers, and his difficulties not only in obtaining their services but in making the necessary financial arrangements to pay them. I do not swallow this testimony whole, but in a doubtful situation must accredit it as sworn to under oath, and undisputed and uncontradicted in its essentials.

It would add unnecessarily to this writing to particularize all the instances in the trial record which show this petitioner with a two or three-year high school education was inept and amateurish in defending himself in a court of law at a jury trial against a trained prosecutor. The petitioner did not open. He did not take the witness stand and conferred with the witnesses in a room provided near the courtroom after the prosecution rested. There was a long charge by the Judge with discussion of the facts and explanation of legal statutes and technical principles. The defendant when inquired of directly by the Judge at the end of the charge whether he had exceptions or requests to the charge, simply said: "No, Sir." (R. 114–154). There were evidentiary problems of consequence, particularly concerning an alleged letter written by defendant to the complainant asking the complainant to accept money from his parents, with ramifications of compounding a felony that the mind of a trained lawyer obviously was needed to keep from the record or else meet it with intelligent strategy. (R. 76, 78; 113, 124).

The disadvantages of untrained representation is shown by one incident when the defendant was cross-examining the complainant during the prosecution's case:

> THE COURT: Ask the question. If you wish to testify you may take the witness stand. That is up to you.
>
> DEFENDANT: I am not familiar with this, Your Honor.
>
> THE COURT: Ask him any question that you wish that is proper. Proceed, please, but don't testify from the floor.
>
> (R. 61. See Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106).

The point does not have to be labored because it has been stated eloquently

years ago that the right to be heard would be of little avail if it did not comprehend the right to be heard by counsel, and even the intelligent layman has little skill in the science of law or familiarity with the rules of evidence. (Powell v. State of Alabama (1932), 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; see also Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357).

■ Throughout this record I find the petitioner-defendant, whether contrived or not, requested the assistance of counsel. We do not have the situation where a defendant may be held to have expressly waived the right to counsel and elected to represent himself at a trial. (United States v. Plattner, 2 Cir., 330 F. 2d 271; United States v. Curtiss, 2 Cir., 330 F.2d 278). At the sentencing several months later, the defendant said he did not wish the services of a lawyer who attempted to appear with him then, saying that legal counsel was really necessary at the trial, not then. The right to counsel is a basic right and the right to choose one's own counsel is a vital element in that right. (Cleveland v. United States, 116 U.S.App.D.C. 188, 322 F.2d 401, 402). Court or prosecution conveniences are to be of secondary consideration in the search for the overriding or waiver of this important right. (Patton v. State of North Carolina, 4 Cir., 315 F. 2d 643). The balancing considerations, troublesome, as noted often, are that the right of counsel cannot be manipulated so as to interfere with the fair administration of justice, but the defendant must have complete confidence in counsel and hence, a change, if it occurs, or even a discharge, will usually point to a continuance. (United States v. Bentvena, 2 Cir., 319 F.2d 916; cert. den. 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed. 2d 271; United States v. Mitchell, 2 Cir., 137 F.2d 1006, 1010).

■■ In the situation here it is far from clear from the record that the delay in trial over a period of five months could be solely attributed to the defendant or his counsel. The case was on several calendars before other Judges, and out of five or six adjournments it seems only two could be attributed to Mrs. Mott, and then she may have had legitimate reason for adjournment. The summer months of July and August were involved. The stratagem of placing criminal cases on calendars to feel out the possibility of plea is known in the prosecution and judicial trade. It must be remembered as significant that delay confined the defendant to jail, and further, that this continued confinement in jail during the trial limited and circumscribed his activity to converse with witnesses or scheme for delay. We should not place the blame, if any, that might be attached to the acts of his counsel or even his own family completely at petitioner's doorstep. Of course, the right to counsel cannot mean continual delay by discharging counsel and refusing to select a new lawyer to defend, but the desire for expedition can furnish no justification for the subversion of the Sixth Amendment to present an effective defense through counsel. (United States v. Mitchell, 2 Cir., 354 F.2d 767, decided 1/13/66).

■ This defendant, confined in prison for months, was caught in a whirlwind of fast-moving events reaching crescendo in bizarre courtroom scenes, over which it would seem fairly undisputable were in the main beyond his control. I do not want to leave any inference that Judge Leibowitz callously deprived petitioner of assistance and advice throughout the trial as to rights. However, as the brief in Gideon filed in the Supreme Court noted, reliance on a trial judge to assert defendant's rights is misplaced, because a man cannot be both a judge and counsel. (Gideon's Trumpet, Lewis, pg. 135). Justice Stewart commented during the oral argument in Gideon that a judge's job is to be a judge. (id. pg. 179). I am unable to find fraud or bad faith proven satisfactorily on the part of the defendant or his family in the discharge of his counsel. Suspicion is not enough even though based upon good intuitive experience, and is a weak

basis upon which to curtail or forfeit basic constitutional rights. The offer of legal aid counsel with the declaration of one-hour limitation for consultation was not, in my opinion, an effective offer of assistance of counsel to warrant the finding of a waiver. (See People v. Douglas, 19 A.D.2d 455, 244 N.Y.S.2d 55).

 Justice Frankfurter explained our judicial policy now fully accepted in constitutional challenges of this kind. Determinations must not be influenced by certitude of guilt or by the fact that the defendant is a bad man with a long criminal record. Justice Frankfurter concluded that this is not out of tenderness for the accused, but because we have reached a certain stage of civilization. (Stein v. State of New York, 346 U.S. 156, 200, 73 S.Ct. 1077, 97 L.Ed. 1522, Frankfurter dissenting; see also United States v. Tateo (SDNY), 214 F.Supp. 560, 567).

In my judgment, Gideon's trumpet, which blew a steady and welcome note that no man in this country should be put to trial on a serious charge without a lawyer when he wanted one, would be drastically muted if this conviction and severe sentence are allowed to stand. (Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L. R.2d 733). I have firm impression from the over-all records before me in this federal presentation that the competing considerations balance out to favor the cause of the petitioner. It is not my province to question the quality of the evidence presented against the petitioner, because my task is to decide whether there was fair opportunity afforded the petitioner—to meet it in accord with the constitutional provisions in the Sixth and Fourteenth Amendments to have the assistance of counsel for defense and due process of law.

The writ of habeas corpus is sustained, and the judgment of conviction challenged is set aside as void. If appeal from the judgment and order herein is taken, the petitioner may be held in the custody of the Respondent Warden pending decision on the appeal. If appeal is not taken, the petitioner may be held in Kings County for retrial on the charges in the indictment. If such action is not promptly taken, the writ is sustained fully and the petitioner is to be discharged from custody.

This is a final order and judgment. If necessary for the transfer of the petitioner from the custody of the Warden to the lawful custodian in Kings County for defendants awaiting trial on indictments, a form of order or judgment in accordance herewith shall be submitted by the Attorney General of New York or the District Attorney of Kings County.

It is so ordered.