Ronald JOHNSON, Harry J. Bonner and James A. Cotter, Individually and on behalf of others similarly situated, Plaintiffs,

v.

Richard C. LEE, Individually and as Mayor of the City of New Haven, George R. Tiernan, Individually and as State's Attorney for the County of New Haven, Hon. Raymond J. Devlin, Individually and as Judge of the Superior Court for the County of New Haven, Francis V. McManus, Individually and as Chief of Police of the City of New Haven, Harold E. Hegstrom, Individually and as Connecticut State Jail Administrator, Leo J. Mulcahy, Individually and as Commissioner of State Police of the State of Connecticut, Robert K. Killian, Individually and as Attorney General of the State of Connecticut, John Doe, Individually and as Agent in Charge of the New Haven Office of the Alcohol Tax Unit of the United States Internal Revenue Service, and Richard Roe, Individually and as the Agent in Charge of the New Haven Office of the Connecticut Alcohol & Tobacco Tax Division, Defendants.

Civ. A. No. 12404.

United States District Court
D. Connecticut.

Feb. 14, 1968.*

* Plaintiffs' motion for a stay denied by Court of Appeals for the Second Circuit on Feb. 19, 1968.

William M. Kunstler, New York City, Michael J. Kennedy, New York City, Jonathan W. Lubell, Westport, Conn., and Stephen L. Fine, Westport, Conn., for plaintiffs.

Thomas F. Keyes, Jr., Corp. Counsel, New Haven, Conn. (Roger J. Frechette, Asst. Corp. Counsel, New Haven, Conn., on the brief) for defendants Mayor Richard C. Lee and Chief of Police Francis V. McManus.

George R. Tiernan, State's Atty. for New Haven County, New Haven, Conn., defendant pro se.

Robert K. Killian, Atty. Gen., Hartford, Conn., defendant pro se and for defendants Hon. Raymond J. Devlin, Harold E. Hegstrom, Leo J. Mulcahy, and "Richard Roe".

John Cassidento and J. Daniel Sagarin, Asst. U. S. Attys., New Haven, Conn., for defendant "John Doe".

TIMBERS, Chief Judge.

## QUESTION PRESENTED

Plaintiffs, currently on trial in a criminal case in the Superior Court of the State of Connecticut, New Haven County, where they are charged with conspiring to injure persons and property by means of explosives, have filed a complaint in this Court seeking declaratory and injunctive relief to halt the state court criminal trial.

Plaintiffs' motions in this Court to convene a three-judge district court and for issuance of a temporary restraining order to enjoin the state court prosecution present the threshold question of this Court's jurisdiction over the subject matter of the action.

After a hearing at which counsel for all parties were fully heard and after considering plaintiffs' complaint, motions, affidavits and exhibits, and briefs by counsel for all parties, the Court concludes that it does not have jurisdiction over the subject matter of the action. Accordingly, plaintiffs' motions to convene a three-judge district court and for issuance of a temporary restraining order are denied, and the complaint is dismissed.

## PLAINTIFFS' CLAIMS AND RELIEF SOUGHT IN THIS COURT

The verified complaint filed February 8, 1968 in this civil action seeks the convening of a three-judge district court pursuant to 28 U.S.C. §§ 2281 and 2284 to declare invalid and enjoin the enforcement of Conn.Gen.Stat. § 53–80 (Explosives Intended for Injury of Person or Property) and Conn.Gen.Stat. § 54–197 (Conspiracy) on the ground that these statutes are unconstitutional on their face and as applied to plaintiffs, and that prosecutions and threatened prosecutions pursuant thereto are causing irreparable harm to plaintiffs and those similarly situated. On the basis of this complaint and plaintiffs' motions to convene a three-judge court and to issue a temporary restraining order, the Court on February 9 ordered a hearing on February 12 to consider the motions and the threshold question of jurisdiction.

Plaintiffs Johnson and Bonner each alleges he is a "black citizen" of the United States residing in New Haven; plaintiff Cotter alleges he is a "white citizen" of the United States residing in New Haven. Each belongs to the Hill Parents Association, described by plaintiffs as an incorporated association "dedicated to the achievement of freedom, equality and a more abundant and fulfilling life for the residents of the black ghetto areas of the City of New Haven." Plaintiffs bring the instant action individually and on behalf of others similarly situated.

Plaintiffs and three others have been on trial since February 6, 1968 in the Superior Court of the State of Connecticut, New Haven County, for conspiring in violation of Conn.Gen.Stat. §§ 53–80 and 54–197, the laws which plaintiffs now attack. Specifically plaintiffs are charged in the Superior Court by written information dated January 2, 1968 as follows:

"that on divers days from November 2, 1967, to December 23, 1967, at the City of New Haven and other places in the County of New Haven and State of Connecticut, [they] did combine, conspire, confederate, and agree together and with divers other persons to cause injury to persons and property in the City of New Haven and divers other places in the County of New Haven by means of explosive materials and compounds which they acquired for said purposes aforesaid, in violation of Section 54–197 of the General Statutes."

Defendants are Richard C. Lee, Mayor of the City of New Haven; George R. Tiernan, State's Attorney for New Haven County; Hon. Raymond J. Devlin, Judge of the Superior Court of the State of Connecticut; Francis V. McManus, Chief of Police of the City of New Haven; Harold E. Hegstrom, Connecticut State Jail Administrator; Robert K. Killian, Attorney General of the State of

Connecticut; Leo J. Mulcahy, Commissioner of the Connecticut State Police; "John Doe", whose real identity is unknown to plaintiffs, Agent in charge of the New Haven Office of the Alcohol Tax Unit of the United States Internal Revenue Service; and "Richard Roe", whose real identity is unknown to plaintiffs, Agent in charge of the New Haven Office of the Connecticut Alcohol & Tobacco Tax Division. Each defendant is sued individually and in his official capacity.

Plaintiffs' complaint alleges jurisdiction in this Court pursuant to 28 U.S.C. §§ 1331(a), 1343(3) and (4), 2201, 2202, 2281 and 2284, and 42 U.S.C. §§ 1981, 1983 and 1985 and under the First, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the Constitution of the United States. Plaintiffs also allege that the amount in controversy exceeds $10,000, exclusive of interest and costs.

Plaintiffs allege as a first cause of action that under color of Connecticut statutes defendants have embarked upon a common plan to deprive them and other members of the Hill Parents Association of their constitutional rights by prosecuting them pursuant to Conn.Gen.Stat. § 54–197 for conspiracy to violate Conn. Gen.Stat. § 53–80. Plaintiffs claim that the prosecutions are without any basis in fact and that the statutes are void and illegal on their face and as applied to plaintiffs because they violate the Constitution of the United States and in particular the First, Fourth, Fifth, Sixth, Eighth, Thirteenth and Fourteenth Amendments thereto. More particularly plaintiffs aver that the statutes violate the guarantees of free speech, press, assembly, the right to petition the government for redress of grievances,

and the guarantee of due process of law in that they are vague and indefinite and fail to meet the requirement of certainty in criminal statutes. Plaintiffs contend that the sole purpose of defendants' threatening to enforce these statutes is to deter and prevent plaintiffs and others connected with the Hill Parents Association from exercising the aforementioned constitutional rights and from working to enforce freedom and equality under the law as guaranteed by the Thirteenth, Fourteenth and Fifteenth Amendments.

As a second cause of action, plaintiffs allege that they have not been afforded sufficient opportunity to obtain counsel of their choice in violation of the Sixth Amendment to the Constitution of the United States.

In addition to seeking injunctive and declaratory relief through the convening of a three-judge district court, plaintiffs seek a temporary restraining order pursuant to 28 U.S.C. § 2284(3) enjoining defendants from enforcing in any way against plaintiffs the provisions of Conn. Gen.Stat. §§ 54–197 and 53–80 or, in the alternative, continuing the trial of plaintiffs in the Superior Court for a reasonable period to permit them to obtain counsel of choice.

## CLAIMS THAT STATE STATUTES ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO PLAINTIFFS

■■ Although 28 U.S.C. § 2283, prohibiting federal court injunctions of state court proceedings already in progress, would not bar or make inappropriate the granting of the declaratory relief here sought by plaintiffs,[1] and assuming without deciding that it also would not bar the granting of the injunctive relief sought,[2] the Court holds that plaintiffs'

---

1. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), holds that "a request for a declaratory judgment that a state statute is overbroad on its face must be considered independently of any request for injunctive relief against the enforcement of that statute" and "a federal district court has the duty to decide the appropriateness and the merits of

the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction."

2. The prohibition of 28 U.S.C. § 2283 does not apply where another Act of Congress grants an exception. The question remains open whether the Civil Rights Act, 42 U.S.C. § 1983, here invoked by plain-

complaint fails to raise a substantial federal question with respect to any state statutes and, therefore, the convening of a three-judge court must be denied and the complaint dismissed.

■■■ It is the function of this Court, in light of plaintiffs' demand for the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284, to determine whether a substantial constitutional question has been raised with respect to the state statutes under attack, whether the complaint sets forth any grounds for equitable relief, and whether the other requirements for a three-judge court are here met. Idlewild Liquor Corp. v. Epstein, 370 U.S. 713, 715 (1962); Ex parte Poresky, 290 U.S. 30 (1933); Green v. Board of Elections, 259 F.Supp. 290, 292 (S.D.N.Y.1966), aff'd, 380 F.2d 445 (2 Cir. 1967). If the complaint fails to raise a substantial federal question with respect to a state statute, a three-judge court must be denied and the action dismissed. Swift & Co. v. Wickham, 382 U.S. 111, 115 (1965); California Water Service Co. v. City of Redding, 304 U.S. 252, 254–255 (1938); Ex parte Poresky, supra; Green v. Board of Elections, 380 F.2d 445, 448 (2 Cir. 1967); Offermann v. Nitkowski, 378 F.2d 22 (2 Cir. 1967); Utica Mutual Insurance Co. v. Vincent, 375 F.2d 129, 130 (2 Cir. 1967); Powell v. Workmen's Compensation Board, 327 F.2d 131, 138 (2 Cir. 1964); Bell v. Waterfront Comm., 279 F.2d 853, 857–

858 (2 Cir. 1960). The criterion for determining substantiality was set forth by the Supreme Court in California Water Service Co. v. City of Redding, supra, at 255: "The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject." Green v. Board of Elections, 380 F.2d at 448; Utica Mutual Insurance Co. v. Vincent, supra, at 131.

■ The Court is aware of the role of a federal court in insuring that free expression and other constitutionally protected rights are not destroyed or inhibited by unconstitutionally vague statutes or improper prosecutions or threats of prosecution. Zwickler v. Koota, supra note 1; Keyishian v. Board of Regents, 385 U.S. 589 (1967); Dombrowski v. Pfister, supra note 2; Baggett v. Bullitt, 377 U.S. 360 (1964). But the mere fact that people who happen to be members of a civil rights group are arrested does not automatically mean that the laws under which they are charged are unconstitutional for vagueness or other reasons, or that their arrest and prosecution are part of a scheme to discourage or prevent the exercise of protected rights.

■ The charge that the statutes here involved are unconstitutional on their face is clearly without any merit what-

tiffs, authorizes such an exception. See Cameron v. Johnson, 381 U.S. 741 (1965). Cf. Dombrowski v. Pfister, 380 U.S. 479, 484, n. 2 (1965). In *Cameron*, the Supreme Court remanded the case to the District Court for a determination of the issue; and that decision, 262 F. Supp. 873 (S.D.Miss.1966), holding that 42 U.S.C. §. 1983 does not authorize a federal court to enjoin state court proceedings then in progress, is currently on appeal to the Supreme Court where probable jurisdiction has been noted and the case transferred to the appellate docket. 389 U.S. 809 (1967). As pointed out by Circuit Judge Smith in Barber v. Kinsella, 277 F.Supp. 72, n. 5 (D.Conn. 1967), the Fourth Circuit also has held

that 42 U.S.C. § 1983 does not provide an exception, Baines v. City of Danville, 337 F.2d 579 (4 Cir. 1964), cert. denied, 381 U.S. 939 (1965). The Third Circuit, however, has held that it does. Cooper v. Hutchinson, 184 F.2d 119 (3 Cir. 1950). The District Court in Ware v. Nichols, 266 F.Supp. 564, 569 (N.D.Miss.1967), avoided the problem when declaring a statute unconstitutional on its face by saying that it assumed that the state and county officials would not continue to prosecute under an unconstitutional statute. This latter approach appears to be in keeping with the Supreme Court's recent decision in Zwickler v. Koota, supra note 1. See also Baker v. Binder, 274 F.Supp. 658 (W.D.Ky.1967).

soever.[3] Plaintiffs are actually charged with violation of Conn.Gen.Stat. § 54–197 (Conspiracy) which provides in relevant part as follows:

"Any person who combines, confederates or agrees with another or others to accomplish any unlawful object by lawful means, or any lawful object by unlawful means, or any unlawful object by unlawful means, if one or more of such persons do any act in furtherance of such combine, confederation or agreement, shall be fined * * * or imprisoned * * * or both * * *"

This statute represents nothing more than a classic statement of the common law crime of conspiracy. To attack it as unconstitutional on its face, is to attack similar statutes of the states and of the United States. See e. g., 18 U.S.C. § 371. As the Supreme Court noted in Scales v. United States, 367 U.S. 203, 225 (1961), the concept of conspiracy "manifest[s] the more general principle that society, having the power to punish dangerous behavior, cannot be powerless against those who work to bring about that behavior." There can be no doubt as to the validity of this statute.

■■■ Of course, a conspiracy "is defined by its criminal purpose" so that plaintiffs have a right to call attention to the statute which defines the underlying substantive offense upon which the conspiracy charge rests. Id. at 229. That statute, Conn.Gen.Stat. § 53–80 (Explosives Intended for Injury of Person or Property), provides:

"Any person who manufactures, transports, has or disposes of any explosive material or compound, knowing, intending or having reason to believe that the same is to be used for the injury of any person or property, or, directly or indirectly, encourages, incites or advocates any such use of any explosive material or compound, or solicits or contributes money for any such purpose, or wilfully causes or attempts to cause any injury to person or property, by the use of any explosive compound, shall be fined * * * or imprisoned * * * or both."

It is difficult to conceive of a criminal statute with greater justification. Moreover, the use of the words "encourages", "incites", and "advocates" is entirely proper under the circumstances. See Turner v. LaBelle, 251 F.Supp. 443, 446 (D.Conn.1966). See also Barber v. Kinsella, supra note 2. The use of the word "indirectly" is also proper when read, as it must be, as synonymous with "in any manner"—the phrase contained in Conn.Gen.Stat. § 53–44, the statute under consideration in Turner v. LaBelle. What was said by Judge Smith in that case is equally applicable, if not more applicable,[4] here:

" * * * the statute is neither overboard nor vague, nor does it, though precise, penalize constitutionally protected conduct. To encourage an assault on a policeman or individual is 'likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest * * *.' Terminiello v. City of Chicago, 337 U.S. 1, 4–5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949); Feiner v. People of State of New York, 340 U.S. 315, 171 S.Ct. 303, 95 L.Ed. 267 (1951); Cantwell v. State of Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)." (pp. 446–447)

Merely alleging that statutes are unconstitutional on their face does not make

3. At the hearing before this Court on February 12, 1968, plaintiffs' counsel said there is no "serious claim" that the statutes are unconstitutional on their face. In view of the allegations of the complaint, however, the Court believes it is incumbent upon it to rule on that claim.

4. In Turner v. LaBelle, the Court found it necessary to read out of the statute the words "justifies" and "praises". No such language is contained in the instant statute.

them so. Conn.Gen.Stat. §§ 53–80 and 54–197 are so clearly constitutional that no substantial federal question has been raised in this respect.

■ Although statutes may be constitutional on their face, it still may be necessary and proper for a three-judge court to intervene where these statutes are being unconstitutionally applied. Cameron v. Johnson, supra note 2; Dombrowski v. Pfister, supra note 2; Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2 Cir. 1967). But compare Moss v. Hornig, 214 F.Supp. 324 (D. Conn.1962), aff'd, 314 F.2d 89 (2 Cir. 1963). Plaintiffs make the broad allegations that their current state prosecutions are without any basis in fact and that the prosecutions are solely for the purpose of discouraging and preventing plaintiffs and other Hill Parents Association members from exercising their various constitutional rights, including their first amendment right of free expression. If these totally conclusory allegations were in any way supported by factual allegations, the "chilling effect" rationale of *Dombrowski* would merit the convening of a three-judge court to give further consideration to plaintiffs' complaint. But plaintiffs utterly fail to offer anything in the way of factual allegations or support.[5] In fact, plaintiffs' own complaint discloses that the warrants of arrest as well as the search warrants involved in the Superior Court proceedings were issued on the basis of sworn affidavits of Plassie Williams, of the Connecticut Alcohol and Tobacco Tax Division, and Philip Salafia, Jr., a member of the Connecticut State Police Department. These affidavits are particularly revealing, both to the extent that they refute plaintiffs' contentions and to the extent that they demonstrate how far this case is removed from the area of free expression and civil rights. The Salafia and Williams affidavits, each sworn to December 29, 1967, are attached hereto as Appendices A and B, respectively.[6]

In view of these affidavits, probable cause exists for the Superior Court proceedings in which plaintiffs are not merely charged with "encouraging", "inciting", or "advocating" the use of explosives to cause injury, but with actually conspiring so to use them.

■ Under all these circumstances the Court finds that plaintiffs have not raised a substantial federal question with respect to the validity or application of the Connecticut statutes here involved.

## CLAIM OF INSUFFICIENT TIME TO OBTAIN COUNSEL

■ Plaintiffs, as a second cause of action, allege that the Superior Court trial judge has not afforded them sufficient opportunity to obtain counsel of their choice and, as a minimum, plaintiffs seek an order continuing the Superior Court trial until they have had such an opportunity. Claimed deprivation of adequate time to obtain counsel may under certain circumstances raise a substantial federal question under the Sixth Amendment and due process clause of the Fourteenth Amendment. United States v. McMann, 386 F.2d 611 (2 Cir. 1967), aff'g, 252 F.Supp. 539 (N.D.N.Y. 1966); United States v. Mitchell, 354 F. 2d 767 (2 Cir. 1966). But as the Supreme Court has said in Ungar v. Sarafite, 376 U.S. 575, 589 (1964), "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." It is, however, unnecessary to decide whether plaintiffs' contentions with respect to this issue are so wholly devoid

---

5. Contrast the situation in *Dombrowski*, 380 U.S. at 482, where appellants' complaint was accompanied by supporting affidavits and a written offer of proof.

6. At the hearing before this Court on February 12, 1968, all counsel agreed that the Court should take judicial notice of all proceedings in the Superior Court criminal case, including the complete file therein.

of merit as to fail to present a substantial federal question. The action of the Superior Court judge in refusing to grant a continuance is entirely unrelated to the constitutionality of any state statute. Therefore, the requirement for the convening of a three-judge court pursuant to 28 U.S.C. § 2281, that the constitutionality of a state statute be brought into question, is not met.

█ Even if this question were addressed to the Court as a single judge,[7] the Court would find it necessary to abstain from interfering with the already commenced criminal proceedings in the Superior Court. Stefanelli v. Minard, 342 U.S. 117, 120 (1951); Douglas v. City of Jeannette, 319 U.S. 157, 163–164 (1943); Hall v. New York, 359 F.2d 26 (2 Cir. 1966), cert. denied, 385 U.S. 879 (1966). None of the circumstances noted in Zwickler v. Koota, supra note 1, and Dombrowski v. Pfister, supra note 2, exists in relation to this issue. No irreparable injury will occur to plaintiffs if the state judge has acted improperly; adequate remedy exists through the normal state appellate procedure and by eventual application to the United States Supreme Court if that becomes necessary and proper. As stated in Moss v. Hornig, 314 F.2d 89, 91 (2 Cir. 1963):

> "Federal courts of equity have always been loathe to restrain criminal prosecutions by states, even on constitutional grounds, where all constitutional issues can be decided in the first instance as a matter of course by the state courts."

Moreover, the concluding language of the United States Supreme Court in Stefanelli v. Minard, supra, at 122–125, is particularly appropriate here:

> "In Douglas v. City of Jeannette, supra, the Court, speaking through Chief Justice Stone, said:

> 'Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved. Hence, courts of equity in the exercise of their discretionary powers should conform to this policy by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; * * *.' Id., at 163.

No such irreparable injury, clear and imminent, is threatened here. At worst, the evidence sought to be suppressed may provide the basis for conviction of the petitioners in the New Jersey courts. Such a conviction, we have held, would not deprive them of due process of law. Wolf v. Colorado, [338 U.S. 25 (1949)].

If these considerations limit federal courts in restraining State prosecutions merely threatened, how much more cogent are they to prevent federal interference with proceedings once begun. If the federal equity power must refrain from staying State prosecutions outright to try the central question of the validity of the statute on which the prosecution is based, how much more reluctant must it be to intervene piecemeal to try collateral issues.

The consequences of exercising the equitable power here invoked are not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range— would invite a flanking movement against the system of State courts

---

7. Here again it is assumed that 28 U.S.C. § 2283 would not preclude granting the relief sought.

by resort to the federal forum, with review if need be to this Court, to determine the issue. Asserted unconstitutionality in the impaneling and selection of the grand and petit juries, in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court— all would provide ready opportunities, which conscientious counsel might be bound to employ, to subvert the orderly, effective prosecution of local crime in local courts. To suggest these difficulties is to recognize their solution.

Mr. Justice Holmes dealt with this problem in a situation especially appealing: 'The relation of the United States and the Courts of the United States to the States and the Courts of the States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years and can not be disposed of by a summary statement that justice requires me to cut red tape and to intervene.' Memorandum of Mr. Justice Holmes in 5 The Sacco-Vanzetti Case, Transcript of the Record (Henry Holt & Co., 1929) 5516. A proper respect for those relations requires that the judgment below be

*Affirmed.*"

The current vitality of *Stefanelli* was recognized by the Court of Appeals for this Circuit as recently as April 1, 1966 in Hall v. New York, supra, at 28.

For all these reasons plaintiffs' motion for the convening of a three-judge court pursuant to 28 U.S.C. §§ 2281 and 2284 and for issuance of a temporary restraining order pursuant to 28 U.S.C. § 2284 (3) must be denied, and the complaint dismissed.

## ORDER

ORDERED that:

(1) Plaintiffs' motion to convene a three-judge district court is denied.

(2) Plaintiffs' motion for issuance of a temporary restraining order is denied.

(3) Plaintiffs' complaint is dismissed for lack of subject matter jurisdiction, but without costs.

———◆———

## APPENDIX A

STATE OF CONNECTICUT 
COUNTY OF NEW HAVEN } ss    New Haven, December 29, 1967.

I, Philip Salafia, Jr., a member of the Connecticut State Police Department, being duly sworn, depose and say:—

On November 18, 1967, I was assigned in an undercover capacity by Lt. Wayne Bishop, to assist the New Haven Police Department in gathering information concerning a plot to blow up buildings in the New Haven area by use of explosives.

After conferring with Inspector Ahern and Detective Pastore of the New Haven Police Department on November 18, 1967, I checked into the New Haven Motor Lodge on November 20, 1967. Jimmy Cotter and Ronnie Johnson came to my room. Johnson said he wanted to see the machine gun that he believed I brought with me. He said he wanted to pay five (5) sticks of dynamite for one machine gun. Johnson looked over the machine gun and said he didn't want the stock of the machine gun because it made it too bulky. He said he wasn't going to make any buy until his man checked it. He said he had many responsible people in his organization and he wanted several machine guns. Johnson informed me of his plot; he was interested in the law and wanted to break the back of the law; that they were going to blow up The First New

Haven National Bank and The Second National Bank in New Haven. He said he was going to blow the police station sky high and he was going to kill some New Haven Police Officers. He said he was going to do this at the first big snowfall. He said that the banks and police station would be blown up simultaneously, and that the police would be busy enough with traffic and snow removal. Johnson said that he had the New Haven Police Department code and was going to use this information to complete the plot. Johnson wanted to take the machine gun with him so that his mechanic could check it over. I refused. He asked me if I could supply him with silencers for six (6) 38 caliber weapons.

On November 24, 1967, Agent Plassie Williams of the Alcoholic Tax Unit and myself, took residence in Cabin No. 14 of Stanley's Motel which is located on Route 1, Milford, near the Milford Shopping Center. Ron Johnson arrived with another colored male whom he introduced as Tip-Top; with them was Jimmy Cotter. Johnson and Tip-Top said that they had forty (40) sticks of dynamite with them and wanted to make a transaction for machine guns. They said that their plans to blow up the banks and police station remained the same. Johnson wanted to show us the dynamite so he sent Cotter out to the car to get one (1) stick. It was wrapped in brown paper and appeared to be packaged in sawdust, and had the words, "American Cyanamid 40%" printed on its surface. Agent Williams purchased five (5) sticks of dynamite for Fifteen Dollars ($15.00) which he handed to Tip-Top. Tip-Top gave Johnson $10.00 and put $5.00 in his own pocket.

/s/ Philip Salafia, Jr.

Philip Salafia, Jr.

Connecticut State Police Department

Subscribed and sworn to this 29th day of December, A. D., 1967, before me.

/s/ Catherine Marangell

Catherine Marangell

Notary Public

My Commission expires:

March 31, 1969.

---

### APPENDIX B

STATE OF CONNECTICUT
COUNTY OF NEW HAVEN } ss New Haven, December 29, 1967.

I, Plassie Williams, being a member of the Alcohol and Tobacco Tax Division for the past two (2) years, being duly sworn, depose and say:—

On November 24, 1967, 11:15 p. m., at a location in Milford, Connecticut, known as Stanley's Motel, Cabin No. 14, I met with persons known to me as Ronald Johnson, Buddy Bonner, and Jimmy Cotter. Also present was State Police Officer Philip Salafia, Jr. At this meeting, Johnson stated that he had thirty (30) sticks of dynamite to exchange for three (3) machine guns, and that Bonner was present as an expert on firearms. Salafia informed Johnson that he had no intention of selling three machine guns for thirty sticks of dynamite. Johnson went on to say that he had forty (40) sticks of dynamite in the car and would sell a few sticks at three dollars ($3.00) per stick. I then asked to see a stick of dynamite to which Johnson signalled Cotter to go outside. Cotter exited the premises for a few seconds and re-entered with one (1) forty percent (40%) gelatin stick of dynamite. A short time later Johnson and I agreed that I could purchase five (5) sticks for $15. Cotter again obtained the dynamite and placed four sticks on the bed. For the five sticks of dynamite I gave Bonner $15.00;

one ten dollar bill and one five dollar bill, of which he immediately gave the ten dollar bill to Johnson. As for plans in the New Haven area, Johnson stated that he and his followers plan to use the dynamite for blowing up stone and brick buildings; that they lack fuses and caps for the dynamite; that they have access to all the dynamite needed for their planned operation; that they have all the money necessary; that they have scientists and "everybody" to help in the operation; and that they would like to obtain as much plastic explosives as possible. Johnson stated that he would take care of me financially if I could provide the plastic type explosives.

November 29, 1967. On this date, at approximately 5:10 p. m., I met Ronald Johnson at the home of his sister Gail, at a location on Congress Avenue near Baldwin Street. At this time, Johnson and I went out to my car. Johnson at this time questioned me as to the extent that plastic explosives surpassed dynamite. He wanted to know exactly to what extent the plastic explosives would destroy big brick buildings. Johnson stated that he and his followers had sufficient help in their destruction plot. At this time, Johnson suggested that we take a drive. I followed his directions, driving to and parking on a side street near a residential area, near Sheffield Street. During this time, Johnson stated that he and his followers had gotten rid of the forty-six (46) sticks of dynamite which he had at our first meeting and had acquired forty (40) other sticks, and that they were about to obtain 75 percent gelatin sticks of dynamite in the near future. He further stated that "the bombing has been put off for awhile" and that although the Black people were in the minority race, they could still bring this country to its knees. Johnson exited the car stating that he would return in a few minutes and walked down Sheffield Street out of view. In approximately 15 minutes, he returned stating that he would be able to buy as much plastic explosives as I could supply.

December 22, 1967. At 8:05 p. m., I contacted Johnson by telephone informing him of the plastic explosives and machine gun which I had to exchange for dynamite. Johnson stated that he had one (1) case of dynamite which contained forty (40) sticks of the forty percent (40%) gelatin type and that he was expecting to get another case the following day. I informed him that he should bring the one case in his possession and some money for the proposed swap. Johnson agreed, stating that he would meet me in a couple of hours. I asked why so long, to which he replied he would have to make a number of telephone calls, get some help, and pick up a truck. This scheduled meeting never took place.

December 23, 1967—10:00 a. m. I again contacted Johnson by telephone informing him that if he wanted to trade, he should meet me right away. He stated he still wanted to trade and would meet me between 11:00 and 12:00 o'clock. At 12:20 p. m., I admitted Johnson to Room 102 of the New Haven Motor Inn. At this time I saw a man now known to me as Curtis Belton, waiting in a black and blue Plymouth. Johnson went immediately to the telephone and made a call. He informed his party to bring "the stuff on over." He then called Belton inside and asked me what I had to trade for. I informed him that I had a quantity of plastic explosives and a couple of machine guns. Johnson stated that the one case of dynamite would be there in about twenty (20) minutes. In addition to this, he had one hundred dollars ($100.00) in cash. Belton stated that if he had known I wanted dynamite, he would have obtained a couple of cases earlier. He went on to say that he is able to obtain dynamite from a guy who works construction; that depending upon what type dynamite the guy has, 40, 80, or 100 percent gelatin sticks—he can get it, and that he could get a couple of cases later on in the evening. At this time, I asked Johnson what he actually needed and what were his plans for the New Haven area. He stated, "Let's forget the

plans; you bring what we need." He went on to say that he and his followers needed six (6) silencers for 38's and were willing to pay one hundred fifty dollars ($150.00) for them; that they needed all the machine guns I could gather because they had no guns on hand; that they needed a case of mace containers; that they needed a base radio for their headquarters, along with about six (6) walkie-talkies; and that they could do with blueprints for silencers if I could not provide the actual silencers. I then asked Johnson if he wanted this material right away, to which he stated, "We want everything we can get our hands on now because we may decide to do something right away." He further stated, "The bombing is off; too much pressure on a couple of us right now." At this time, I asked Johnson what the disturbance was about that prior week to which he stated the kids started things by breaking a few windows. He went on to say that the group's intentions were to finish up where the kids left off. Belton asked if I could provide him with a 32 pistol to carry on his person. He further stated that he at one time worked construction with "the guy" who is actually able to obtain dynamite, and that I could forget about obtaining the mace containers because he knew the formula for the solution. At approximately 1:00 p. m., Jimmy Cotter, along with a man now known to me as Alonzo Russell, entered the room, admitted by Johnson. Russell left the room, at which time I noted a blue panel truck parked in front. I asked Johnson if the panel truck is the one for which we were waiting. He stated, "Yeah, that's the truck and the stuff's inside." Russell then returned to the room followed by a man now known to me as Willis Brooks. Seconds later, Federal, State, and Local Officers entered the room and placed everyone under arrest. Shortly afterward, I saw Detective Nicholas Pastore open the rear door of the blue panel truck and obtain a card-board box containing numerous sticks of dynamite.

/s/ Plassie Williams

Plassie Williams
Alcohol and Tobacco
Tax Division.

Subscribed and sworn to this 29th day of December, A.D., 1967, before me.

/s/ Catherine Marangell

Catherine Marangell
Notary Public

My Commission expires:
March 31, 1969.