380 F.2d 445
 Gilbert GREEN, Plaintiff-Appellant,
v.
BOARD OF ELECTIONS OF the CITY OF NEW YORK, Louis J. Lefkowitz, Attorney General of the State of New York, and Frank S. Hogan, District Attorney of the County of New York, Defendants-Appellees.
 No. 388.
 Docket 30933.
 United States Court of Appeals Second Circuit.
 Argued April 3, 1967.
 Decided June 13, 1967.
 
 COPYRIGHT MATERIAL OMITTED J. Lee Rankin, Corporation Counsel of City of New York, New York City, for defendant-appellee Board of Elections of City of New York.
 Leonard B. Boudin, New York City (Rabinowitz & Boudin, New York City; Victor Rabinowitz, Joan Goldberg and Arthur Schutzer, New York City, of counsel), for appellant.
 Brenda Soloff, Asst. Atty. Gen., (Louis J. Lefkowitz, Atty. Gen. of State of New York; Samuel A. Hirshowitz, First Asst. Atty. Gen.), for other defendants-appellees.
 Frank S. Hogan, Dist. Atty. of County of New York, New York City, pro se.
 Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Plaintiff Gilbert Green was one of the defendants convicted in the well-known case of United States v. Dennis, 183 F.2d 201 (2 Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), of having conspired to organize the Communist Party as a group to teach and advocate the overthrow and destruction of the government by force and violence, and to advocate and teach the duty and necessity of overthrowing and destroying the government by such means, 18 U.S.C. § 11 (1946 ed.), now, as amended, 18 U.S.C. § 2385. He was sentenced to serve a term of five years imprisonment and to pay a fine of $10,000. After the Supreme Court's mandate had issued, he failed to surrender to serve his term and remained a fugitive for more than four and a half years. When he finally surrendered, he was convicted of contempt, 18 U.S.C. § 401(3), and was sentenced for an additional three years. See Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L. Ed.2d 672 (1958). He was released on parole in 1961 and this status was concluded in 1963. Both offenses constituted felonies under federal law, 18 U.S.C. § 1(1).
 
 
 2
 Section 152 of the New York Election Law, McKinney's Consol.Laws, c. 17, enacted pursuant to Article 2, § 3, of that state's constitution,[1] provides in pertinent part that no person "convicted of a felony in a federal court of an offense of which such court has exclusive jurisdiction, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the president of the United States." Green has not been; indeed he has not sought such relief. New York's Penal Law, McKinney's Consol.Laws, c. 40 makes it a felony for any person to register or attempt to register as an elector knowing that he will not be a qualified voter, §§ 510-a and 752. Claiming that these New York statutes deprived him of various rights guaranteed by the Constitution of the United States, Green filed suit in the District Court for the Southern District of New York seeking a declaratory judgment of nullity and negative and affirmative injunctive relief, both temporary and permanent. He asked that a court of three judges be convened pursuant to 28 U.S.C. § 2281 and § 2284 to hear his case. Later he moved for summary judgment and the Attorney General cross-moved to dismiss the complaint both for lack of jurisdiction in failing to present a substantial federal question and also on the merits in failing to state a claim on which relief can be granted. Concluding that the complaint did not state a substantial federal claim, Judge Tyler denied plaintiff's requests and granted the Attorney General's motion to dismiss for want of jurisdiction, 259 F.Supp. 290. Green appeals from that order.
 
 
 3
 It is common ground, as we recently reaffirmed in Utica Mutual Ins. Co. v. Vincent, 375 F.2d 129, 130 (2 Cir. 1967), citing many cases, that "[w]hen a complaint for an injunction makes a claim of unconstitutionality which on its face would require a court of three judges * * *, the single district judge should consider whether the claim is substantial and, if he finds it is not, refuse to convoke a court of three judges and dismiss the action." It is also common ground that such a decision by a district judge is reviewable in the court of appeals and that the criterion is that, as said in California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 866, 82 L.Ed. 1323 (1938): "The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject."
 
 
 4
 In the nature of things, these tests cannot be of mathematical precision. Previous decisions do not always foreclose new consideration even though they are directly on point, as the single district judges correctly thought in convoking three-judge courts in the second flag salute case, Barnette v. West Virginia State Board of Election, 47 F.Supp. 251 (D.W.Va.1942), aff'd, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943), overruling Minersville School District v. Gobitis, 310 U.S. 586, 60 S. Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493 (1940), and in the desegregation case, Brown v. Board of Education, 98 F.Supp. 797 (D.Kan.1951), rev'd. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R. 2d 1180 (1954), overruling Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1897).[2] The other basis for finding lack of substantiality, obvious lack of merit, is still less precise; judges have not been fitted with identical lenses for detecting just when lack of merit is "obviously" such. Although a court of appeals must conscientiously review a single district judge's determination that lack of merit not only exists but is obvious, see Schneider v. Rusk, 372 U.S. 224, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963), little is gained by a finical attitude on the latter score. Although it has long been held that § 2281 applies to the denial as well as the grant of injunctions, Ex parte Metropolitan Water Co., 220 U.S. 539, 31 S.Ct. 600, 55 L.Ed. 575 (1911), and even to dismissal before trial, Ex parte Northern Pacific Ry., 280 U.S. 142, 50 S.Ct. 70, 74 L.Ed. 233 (1929), the evil at which the statute was aimed was the affront to the dignity of a state by a single judge's enjoining enforcement of a statute or regulation as unconstitutional, see Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154-155, 83 S.Ct. 554, 9 L. Ed.2d 644 (1963); D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 5-11, (1964). When the single district judge has denied the injunction and three circuit judges are convinced that the pleadings show the claim to lack merit, they accomplish little save elegantia juris by reversing because they are not completely certain that the lack was so obvious as to have warranted dismissal by one judge rather than three. See Offermann v. Nitkowski, 378 F.2d 22 (2 Cir. 1967). The only practical consequence, if the three judge court should share the views of lack of merit entertained by the single district judge and themselves, as they must confidently suppose it will, is that the plaintiff could then appeal directly to the Supreme Court under 28 U.S.C. § 1253. But this is hardly of great moment in view of the immediate availability of certiorari to the court of appeals and the likelihood of this being granted if the Supreme Court thinks a constitutional claim may have been erroneously rejected.
 
 
 5
 The Constitution as originally adopted said remarkably little about voting qualifications. Article I, § 2, provided that the House of Representatives shall be chosen by electors from each state who "shall have the qualifications requisite for electors of the most numerous branch of the state legislature,"[3] and Article II, § 1, authorized each state to appoint presidential electors "in such manner as the legislature thereof may direct." Nothing was said in regard to state electors. The only provisions of the early Constitution claimed to be offended by the New York statute are the prohibition against a state's passing a bill of attainder, Art. I, § 10, Cl. 1, and the Eighth Amendment's proscription of "cruel and unusual punishments," held to have been made applicable to the states by the Fourteenth, Robinson v. State of California, 370 U. S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
 
 
 6
 That the New York statutes are not bills of attainder is sufficiently demonstrated by the fact that in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion), after stating that the bill of attainder clause only applies "to statutes imposing penalties," see also United States v. Lovett, 328 U.S. 303, 315-316, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Chief Justice used statutes depriving felons of voting rights to illustrate what was not a penal law. He there said that "In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purpose of punishment — that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature. * * * [Because] the purpose of [the statute disenfranchising the convicted felon] is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise." 356 U.S. at 96-97, 78 S.Ct. at 595. See also De Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). Cf. Kennedy v. Mendoza-Martinez, supra, 372 U.S. at 168-169, 83 S.Ct. 554; Flemming v. Nestor, 363 U.S. 603, 613-614, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). We cannot read United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), which condemned, as a bill of attainder, so much of § 504(a) (1) of the Labor-Management Reporting and Disclosure Act of 1959 as prohibited a member of the Communist Party from serving as a union official, as overruling these recent statements sub silentio. The Court in Brown repeatedly emphasized the need for judicial ascertainment of the class of persons to be affected and the lack of this in the statute there under attack, see 381 U.S. at 442-446, 448-449, 450, 455-456, 461, 85 S.Ct. 1707, and characterized "the command of the Bill of Attainder Clause" as being "that a legislature can provide that persons possessing certain characteristics must abstain from certain activities, but must leave to other tribunals the task of deciding who possesses those characteristics," 381 U.S. 454 n. 29, 85 S.Ct. 1718 — exactly what New York has done here. See Comment, The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification, 54 Calif.L.Rev. 212, 235-236 (1965). Besides, the Brown opinion did not prohibit a legislature from summarizing the characteristics with which it is concerned by use of a "semantically equivalent phrase," stating "For example, a legislature might determine that persons afflicted with a certain disease which has as one of its symptoms a susceptibility to uncontrollable seizures should not be licensed to operate dangerous machinery. In enacting a statute to achieve this goal, the legislature could name the disease instead of listing the symptoms * * *. 381 U.S. at 454, n. 29, 85 S.Ct. at 1718. This is all that New York has done by using the term "felon." Indeed, we have rejected an argument that another provision of § 504 barring persons convicted of various crimes from union offices was a bill of attainder. Postma v. Int'l Bhd. of Teamsters, 337 F.2d 609 (2 Cir. 1964).
 
 
 7
 The argument as to cruel and unusual punishment falls on two grounds. Depriving convicted felons of the franchise is not a punishment but rather is a "nonpenal exercise of the power to regulate the franchise." Trop v. Dulles, 356 U.S. at 97, 78 S.Ct. at 596 (plurality opinion). And if it were a punishment, the framers of the Bill of Rights would not have regarded it as cruel and unusual. It is true that with nearly all felonies punishable by death in 18th century England, see Radzinowicz, A History of English Criminal Law, ch. 1 (1948), the voting rights of convicted felons had not been a very live issue there. But eleven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons.[4] Moreover, twenty-nine states had such provisions when the Fourteenth Amendment was adopted,[5] and the total has now risen to forty-two.[6] While it is true that "the words of the Amendment are not precise, and * * * their scope is not static," the great number of states excluding felons from the franchise forbids a conclusion that this is a "cruel and unusual punishment" within the context of "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. at 101, 78 S.Ct. at 598.
 
 
 8
 Plaintiff places heaviest weight on the equal protection clause of the Fourteenth Amendment, relied upon in such landmark decisions as the apportionment cases, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L. Ed.2d 821 (1963), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and the voter qualification cases, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), and Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). But none of those decisions intimates that the states are without power to continue their historic exclusion from the franchise of persons convicted of all or certain types of felonies. Even though the precise issue has not arisen before the Supreme Court, the propriety of excluding felons from the franchise has been so frequently recognized — indeed put forward by the Justices to illustrate what the states may properly do — that such expressions cannot be dismissed as unconsidered dicta. See, in addition to the statements in Davis v. Beason, 133 U.S. 333, 346-347, 10 S.Ct. 299, 33 L.Ed. 637 (1890), and Estep v. United States, 327 U.S. 114, 122 n. 13, (1946), such recent expressions as those in Trop v. Dulles, 356 U.S. 86, 96-97, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Warren, C. J.); Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (Douglas, J.); Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (Douglas, J.); and Harper v. Virginia State Board of Elections, 383 U.S. 663, 673, 675 n. 4, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (dissenting opinion of Black, J.).
 
 
 9
 This general recognition rests on the established principle that "A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935) (Stone, J.). The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due."[7] A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime. See The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice, 45-47, 187-196 (1967). A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be. There may, of course, be crimes that would not come within the definition of a particular state law on exclusion from the franchise, as the Supreme Court of California thought to be the case in Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412 (1966),[8] or which are of such minor significance that exclusion for their commission might raise not only a question of wisdom, as the task force of the President's Crime Commission on Correction has concluded, but even a substantial constitutional question at least if we looked at § 1 of the Fourteenth Amendment alone. But the offenses of which Green was convicted are surely not of that character. Flouting a constitutional statute designed to prevent violent overthrow of the government[9] and refusing for four and a half years to obey the Supreme Court's mandate are strong cases for denial of the franchise. And "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).
 
 
 10
 While this is ample to demonstrate to us the obvious lack of merit in Green's contentions we have yet to mention the point on which New York most heavily relies — the provision in § 2 of the Fourteenth Amendment reducing the basis of representation of a state in the House of Representatives "when the right to vote at any election * * * is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion or other crime * * *." The framers of the Amendment, says the Attorney General, could hardly have intended the general language of § 1 to outlaw a discrimination which § 2 expressly allowed without the penalty of reduced representation. The argument is convincing. We see nothing in the language or in history[10] to support plaintiff's suggestion that "other crimes" meant only a crime connected with the rebellion. The Court's rejection of Mr. Justice Harlan's position that § 2 is the only portion of the Fourteenth Amendment dealing with voting rights, see Reynolds v. Sims, supra, 377 U.S. at 589, 84 S.Ct. 1362, 12 L.Ed.2d 506 in no way indicates it would deny that § 1 of the Amendment cannot be fairly read to prohibit a discrimination which § 2 expressly permits — especially in the light of the Justices' frequent and consistent statements approving voting disqualification for felony.
 
 
 11
 The lack of substance in Green's claim of unconstitutionality thus was sufficiently obvious that Judge Tyler did not need to call on two other judges for reassurance.
 
 
 12
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 This directs the legislature to "enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime."
 
 
 [2]
 Three-judge courts were also convoked on that issue in Briggs v. Elliott, 98 F. Supp. 529 (E.D.S.C.1951), vacated, 342 U.S. 350, 72 S.Ct. 327, 96 L.Ed. 392 (1952), decision on remand, 103 F.Supp. 920 (1952), and Davis v. County School Board, 103 F.Supp. 337 (E.D.Va.1952), both of which were consolidated with theBrown case.
 
 
 [3]
 The Seventeenth Amendment adopted this language as regards elections to the Senate
 
 
 [4]
 Va.Const. Art. 3, § 1 (1776); Ky.Const. Art. 8, § 8 (1799); Ohio Const. Art. 4, § 4 (1802); La.Const. Art. 6, § 4 (1812); Ind.Const. Art. 6, § 4 (1816); Miss.Const. Art. 6, § 5 (1817); Conn. Const. Art. 6, § 2 (1818); Ill.Const. Art. 2, § 30 (1818); Ala.Const. Art. 6, § 5 (1819); Mo.Const. Art. 3, § 14 (1820); N.Y.Const. Art. 2, § 2 (1821)
 
 
 [5]
 In addition to those listed in note 4, supra, the following state constitutions had such provisions: Del.Const. Art. 4, § 1 (1831); Tenn.Const. Art. 4, § 2 (1834); Fla.Const. Art. 6, § 4 (1838); R.I.Const. Art. 2, § 4 (1842); N.J.Const. Art. 2, § 1 (1844); Tex.Const. Art. 7, § 4 (1845); Iowa Const. Art. 2, § 5 (1846); Wisc.Const. Art. 3, § 2 (1848); Calif.Const. Art. 2, § 5 (1849); Md. Const. Art. 1, § 5 (1851); Minn.Const. Art. 7, § 2 (1857); Ore.Const. Art. 2, § 3 (1857); Kan.Const. Art. 5, § 2 (1859); W.Va.Const. Art. 3, § 1 (1863); Nev.Const. Art. 2, § 1 (1864); S.C.Const. Art. 4, § 1 (1865); Ga.Const. Art. 2, § 6 (1868); N.C.Const. Art. 6, § 5 (1868)
 
 
 [6]
 This includes the following additional state constitutions: Alaska Const. Art. 5, § 2; Ariz.Const. Art. 7, § 2, A.R.S.; Ark.Const. Art. 3, § 1; Hawaii Const. Art. 2, § 2; Idaho Const. Art. 6, § 3; Mont.Const. Art. 9, § 2; Neb.Const. Art. 6, § 2; N.M.Const. Art. 7, § 1; N.D.Const. Art. 5, § 127; Okla.Const. Art. 3, § 1; S.D.Const. Art. 7, § 8; Wash.Const. Art. 6, § 3; Wyo.Const. Art. 6, § 6
 
 
 [7]
 An Essay Concerning the True Original, Extent and End of Civil Government ¶ 89
 
 
 [8]
 Insofar as the opinion of the four member majority went beyond construction of the California Constitution and implied that the Federal Constitution forbade denial of the franchise to violators of the Selective Service Act, we think it without basis. See Note, Constitutional Law, Construction of State Disfranchisement Rule under Equal Protection Standards, 66 Col.L.Rev. 1357 (1966)
 
 
 [9]
 While Locke recognized that the people "have reserved that ultimate determination to themselves which belongs to all mankind," he said this lays no "perpetual foundation for disorder" for it "operates not till the inconvenience is so great that the majority feel it, and are weary of it, and find a necessity to have it amended." Supra note 7, ¶ 168
 
 
 [10]
 The general form of § 2 stems from an amendment to H.R. No. 51 offered by Senator Summer on March 12, 1866, which, however, excepted only "participation in rebellion." On April 30 a Joint Committee of the two houses reported the Amendment in its present form. See Van Alstyne, The Fourteenth Amendment, the "Right" to Vote, and the Understanding of the Thirty-Ninth Congress, 1965 Supreme Court Review 33, 60-62