Charles WESLEY, et al.

v.

David COLLINS, et al.

No. 3–84–0795.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 28, 1985.

Albert Bates, Summertown, Tenn., for C. Wesley, et al.

William B. Hubbard, Chief Deputy Atty. Gen., William P. Sizer, Asst. Atty. Gen., Nashville, Tenn., for D. Collins, et al.

## MEMORANDUM

WISEMAN, Chief Judge.

█  In light of the significantly higher number of blacks convicted of felonies over that of whites, does a Tennessee law disenfranchising felons result in the unlawful dilution of the black vote in violation of the United States Constitution or the federal Voting Rights Act? The Court concludes that Tennessee may disqualify convicted felons from the voting public without unlawfully interfering with the equal opportunity of blacks to participate in the political process and to elect representatives of their choice. The Court therefore dismisses the plaintiffs' complaint for failure to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6).

## Facts

Two plaintiffs bring suit in this Court alleging that the Tennessee Voting Rights Act of 1981, T.C.A. § 2–19–143 (1983 Supp.), denies them rights secured under the Fourteenth and Fifteenth Amendments and under the federal Voting Rights Act Amendments of 1982, 42 U.S.C. § 1973(a) & (b) (1984 Supp.). The basic theories underlying plaintiffs' claims are, *first*, that the Equal Protection Clause of the Fourteenth Amendment requires Tennessee to demonstrate a compelling state interst justifying the disenfranchisement of felons since the classification impacts on the fundamental right to vote and, *second*, that the Fourteenth and Fifteenth Amendments and Section 2 of the federal Voting Rights Act proscribe disenfranchisement of felons because such state action results in the unlawful dilution of the black community's voting strength since so many more blacks are convicted of felonies than are whites.

Plaintiff Charles Wesley is an adult black citizen of Tennessee residing in Nashville, Tennessee. In February of 1984, Mr. Wesley entered a plea of guilty before Lewis County Circuit Court to a charge of accessory after the fact to the crime of larceny. The offense is defined as a felony in Tennessee; accordingly, Mr. Wesley's conviction resulted in his disenfranchisement.

On August 20, 1984, Mr. Wesley, along with the Natural Rights Center, a public interest law project active in the civil rights area, filed suit in this Court asserting claims under the federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986 and under the federal Voting Rights Act, 42 U.S.C. § 1973, seeking injunctive and declaratory relief together with nominal and punitive damages. Plaintiffs name as defendants David Collins, the Tennessee Coordinator of Elections and W.J. Michael Cody, Attorney General and Reporter for the State of Tennessee.

In their complaint, plaintiffs allege that a provision of the Tennessee Voting Rights Act requiring the disenfranchisement of felons, although facially neutral, is aimed at an attempt "to further secure the racial purity of the State legislature." Complaint ¶ 17. To bolster their claim, plaintiffs point to historical evidence of the repression of blacks in Tennessee—dating from the period of slavery during the 18th and 19th Centuries and continuing from emancipation to the present—marked by limited access to and segregation in the provision of health care, housing and education, and by sustained efforts to prevent blacks from registering to vote. The plaintiffs assert that disenfranchisement of felons is yet another example of official discrimination against blacks. They argue that under the Tennessee Voting Rights Act disenfranchisement of felons will, with time, progressively dilute the black vote thereby impeding the equal opportunity of blacks to participate in the political process and to elect candidates of their choice. As further support, plaintiffs cite an alleged statistic purporting to demonstrate the ratio of white felons to the general population of Tennessee whites to be approximately 1 to 1000, while the corresponding black ratio to be 1 to 100. Plaintiffs argue that the State of Tennessee lacks a compelling reason to justify disenfranchisement of felons and that the true reason for such state action is to impose a disproportionate disadvantage on blacks.

## Law

### A. *Tennessee Voting Rights Act.*

The Tennessee Voting Rights Act disenfranchises all persons convicted of "infamous crimes," as defined by the laws of Tennessee. T.C.A. § 2–19–143 (Supp.1984) provides:

**Suffrage for persons convicted of infamous crimes.**—The following provisions shall govern the exercise of the right of suffrage for those persons convicted of an infamous crime:

(1) No person who has been convicted of an infamous crime, as defined by § 40–20–112, in this state shall be permitted to register to vote or vote at any election unless he shall have been pardoned by the governor, or his full rights of citizenship have otherwise been restored as prescribed by law. Provided, however, the

governor may attach to any such pardon a special condition that such person shall not have the right of suffrage until a date certain in the future, or until the expiration of the pardoned sentence, whichever period of time is less.

(2) No person who has been convicted in federal court of a crime or offense which would constitute an infamous crime under the laws of this state, regardless of the sentence imposed, shall be allowed to register to vote or vote at any election unless he shall have been pardoned or restored to the full rights of citizenship by the President of the United States, or his full rights of citizenship have otherwise been restored in accordance with federal law, or the law of this state.

(3) No person who has been convicted in another state of a crime or offense which would constitute an infamous crime under the laws of this state, regardless of the sentence imposed, shall be allowed to register to vote or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his full rights of citizenship have otherwise been restored in accordance with the laws of such other state, or the law of this state.

(4) The provisions of this section, relative to the forfeiture and restoration of the right of suffrage for those persons convicted of infamous crimes, shall also apply to those persons convicted of crimes prior to May 18, 1981, which are infamous crimes after May 18, 1981.

"Infamous crimes" are defined under the Tennessee Code as felony convictions.

Upon conviction for any felony, it shall be the judgment of the court that the defendant be infamous and be immediately disqualified from exercising the right of suffrage.

T.C.A. § 40–20–112 (1982). Accordingly, all persons who have been convicted of crimes which at the time of conviction were defined as infamous are disenfranchised and no longer have the right to vote in Tennessee.[1]

▬ The challenged Tennessee provision is authorized both by the United States and Tennessee Constitutions. Section 2 of the Fourteenth Amendment empowers states to disenfranchise persons convicted for "participation in rebellion, or other crimes."[2] U.S. Const., amend. XIV, § 2. Under the Tennessee Constitution, Article I, Section 5 provides:

The election shall be free and equal, and the right of suffrage, as hereinafter declared, shall never be denied to any person entitled thereto, except upon conviction by a jury of some infamous crime, previously ascertained and declared by law, and judgment thereon by court of competent jurisdiction.

1. In *Gaskin v. Collins,* 661 S.W.2d 865 (Tenn. 1983), the Supreme Court of Tennessee held unconstitutional the retroactive disenfranchisement of citizens convicted of felonies which at the time of conviction were not defined as infamous, but which were later reclassified as infamous under the amended section of the Tennessee Code, T.C.A. § 40–20–112. Interpreting Article I, Section 5 of the Tennessee Constitution, the Court held that a person was subject to disenfranchisement upon conviction of a crime only if that crime was "previously ascertained and declared by law" to be infamous prior to the conviction. *Id.* at 867–68, *quoting* Tenn. Const. art. I, § 5. *Accord Tate v. Collins,* 496 F.Supp. 205 (W.D.Tenn.1980) (enjoining state officials from refusing to issue absentee ballots to prison inmates convicted of "non-infamous" crimes).

2. Section 2 of the Fourteenth Amendment provides:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State. (emphasis added).

Tenn. Const. Art. I, § 5. Constitutional authorization to disenfranchise criminals is addressed further in Article IV, Section 1, which provides:

> All such requirements [to vote] shall be equal and uniform across the state, and there shall be no other qualification attached to the right of suffrage.

> The General Assembly shall have the power to enact laws requiring voters to vote in the election precincts in which they may reside, and laws to secure the freedom of elections and the purity of the ballot box.

Tenn. Const. art. IV, § 1. However, Section 2 provides: "Laws may be passed excluding from the right of suffrage persons who may be convicted of infamous crimes." Tenn. Const., art. IV, § 2. The extension of suffrage to Tennessee citizens is a self-executing constitutional right, whereas exception to the universal grant depends on legislative curtailment of the right. *Crutchfield v. Collins*, 607 S.W.2d 478, 481 (Tenn.App.), *cert. denied* (Tenn.1980). Thus, the Tennessee Legislature is empowered—and has exercised its authority—to disenfranchise those persons convicted of infamous crimes.

**B.** *Disenfranchisement Does Not Abridge An Individual Felon's Rights Under the Fourteenth Amendment.*

■ Plaintiffs argue that because the right to vote is fundamental the State of Tennessee must demonstrate a compelling state interest warranting disenfranchisement of felons so as to satisfy strict judicial scrutiny of the challenged statutory provision. The Court disagrees. While the right to vote ordinarily is deemed a fundamental interest, *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), federal courts consistently have recognized the right of states pursuant to section 2 of the Fourteenth Amendment to disenfranchise persons convicted of "participation in rebellion, or other crimes." [3] In *Richardson v. Ramirez*, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), the Supreme Court upheld a California statute disenfranchising convicted felons, ruling that even in light of the equal protection language of Section 1 of the Fourteenth Amendment (and by implication, the judicial doctrine of strict scrutiny attendant to equal protection analysis), the "affirmative sanction" contained in Section 2 expressly empowered the state to exclude persons convicted of crimes from the ballot box without having to justify such state action under a "compelling state interest" analysis. 418 U.S. at 52–55, 94 S.Ct. at 2669–2671. The Supreme Court distinguished disenfranchisement of felons from other types of state qualifications to voting that were invalidated in prior equal protection cases. 418 U.S. at 54, 94 S.Ct. at 2670, *distinguishing, inter alia, Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residency requirements); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (filing fees for candidacy for public office); *Kramer v. Union Free School*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (property ownership requirements).

■ The right of felons to vote is not fundamental. *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983). Plaintiffs misread clearly established constitutional precedent in citing *Dunn* and *Kramer* for the proposition that Tennessee must justify the disenfranchisement of felons by demonstrating a compelling state interest. In *Tate v. Collins*, 496 F.Supp. 205, 207 (W.D.Tenn.1980), the District Court for the Western District of Tennessee, while ultimately holding Tennessee could not disen-

---

**3.** *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *Shepherd v. Trevino,* 575 F.2d 1110 (5th Cir.1978), *cert. denied* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979); *Green v. Board of Elections,* 380 F.2d 445 (2d Cir.1967), *cert. denied,* 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968); *Owens v. Barnes,* 711 F.2d 25 (3d Cir.) *cert. denied,* — U.S. —, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983); *Beacham v. Braterman,* 300 F.Supp. 182 (S.D.Fla.1969), *aff'd without opinion,* 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969); *Fincher v. Scott,* 352 F.Supp. 117 (M.D.N.C.1972), *aff'd without opinion,* 411 U.S. 961, 93 S.Ct. 2151, 36 L.Ed.2d 681 (1973).

franchise persons convicted of "non-infamous crimes," recognized that the State was constitutionally empowered to disenfranchise felons.

> A state may constitutionally exclude some or all "convicted felons from the franchise ...." *Richardson v. Ramirez*, 418 U.S. 24, 53, 94 S.Ct. 2655, 2670, 41 L.Ed.2d 551 (1974). The State of Tennessee has chosen to deny the right to vote to only those persons convicted of certain types of criminal offenses. In order to lose the right to vote in Tennessee, a person must be convicted of an "infamous crime."
>
> \*    \*    \*    \*    \*    \*
>
> The Tennessee legislature has specifically identified those offenses which it deems infamous.

*Id.* As stated, the Tennessee legislature now defines all felonies as "infamous crimes." T.C.A. § 40–20–112 (1982). Accordingly, for purposes of equal protection analysis under the Fourteenth Amendment, the State of Tennessee is entitled to disenfranchise plaintiff Wesley.

C. *Disenfranchisement of Felons Does Not Unlawfully Dilute the Black Vote Under the Federal Voting Rights Act.*

1. *Protection Against Dilution of the Vote.*

The plaintiffs maintain that as a consequence of centuries of racial discrimination, Tennessee's blacks have suffered under debilitating socio-economic pressures which account, in part, for the significantly higher rate of felony convictions—and disenfranchisement—among blacks as compared to whites. Plaintiffs argue that despite concerted effort to overcome a history of oppression, "[g]iven the disproportionate number of black felons, [disenfranchisement] reverses the progress blacks have made in the past century and turns the black population of this country back toward slavery." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 10. Plaintiffs assert that, relative to the potential voting strength of whites, the number of blacks of voting age is disproportionately reduced by Tennessee's disenfranchisement of felons, and, therefore, the Tennessee statute violates the federal Voting Rights Act by imposing a voting qualification that interferes with the equal opportunity of blacks to effectively participate in the democratic selection of candidates for office.[4]

■ The Voting Rights Act protects the integrity of an individual's vote by prohibiting a state from tampering with the voting potential of the group with whom he identi-

---

4. Disproportionate reduction either in the number of black voters entitled to vote or in the relative weight a single black vote carries constitutes a *dilution* of black voting strength.

> The essence of racial vote dilution ... is this: that primarily because of the interaction of substantial and persistent racial polarization in voting patterns (racial bloc voting) with a challenged electoral mechanism, a racial minority with distinctive group interests that are capable of aid or amelioration by government is effectively denied the political power to further those interests that numbers alone would presumptively give it in a voting constituency not racially polarized in its voting behavior. Vote dilution in this sense can exist notwithstanding the relative absence of structural barriers to exercise of the electoral franchise. It can be enhanced by other factors—cultural, political, social, economic—in which the racial minority is relatively disadvantaged and which further operate to diminish practical political effectiveness.

*Gingles v. Edmisten*, 590 F.Supp. 345, 355 (E.D. N.C.1984) (supplemental opinion) (citations omitted). Typically, dilution charged under the Voting Rights Act appears in the context of reapportionment plans under which, for example, blacks in a particular area are "packed" together to concentrate their already-dominant voting potential in a particular district so as to reduce the black vote potential in other mixed-race districts. Or, on the other hand, the black vote may be diluted by "fragmenting" a concentration of voter strength among a number of predominantly white districts. *See Ketchum v. Byrne*, 740 F.2d 1398, 1408 and n. 8 (7th Cir. 1984). The context of dilution in this case is unique and has not previously been presented before a federal court.

fies.[5] Section 3 of the Voting Rights Act Amendments of 1982 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, *based on the totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are *not equally open to participation* by members of a class of citizens protected by subsection (a) of this section in that *its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (Supp.1984) (emphasis added).[6] Section 2 is a constitutional exercise of congressional authority under the enforcement clauses of the Fourteenth and Fifteenth Amendments.[7] *United States v. Marengo County Commission,* 731 F.2d 1546, 1562–63 (11th Cir.) (Wisdom, J.), *cert. denied,* —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *Senate Report supra* note 6, at 39–43 (discussing the Senate's legal basis for concluding that the Act is consistent with the Constitution).

■ The federal Voting Rights Act was enacted to assure effective participation by racial minorities in the election process, securing not only the opportunity for all *qualified* citizens to cast their ballot, but also guaranteeing that an individual's vote will not be diluted. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The right to such protection flows from "the fundamental principal in this country [that the democratic system mandates] equal representation for equal numbers of people without regard to race, sex, economic status, or place of residence within a State." *Reynolds v. Sims,* 377 U.S. 533, 560–61, 84 S.Ct. 1362, 1380–81, 12 L.Ed.2d 506 (1964) (invalidating a legislative apportionment scheme for the selection of state legislative seats which extended disproportionate electorate power to voters living in sparsely settled, primarily white rural areas); *Wesberry v. Sanders,* 376 U.S. 1, 17–18, 84 S.Ct. 526, 534–35, 11 L.Ed.2d 481 (1964); *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

---

**5.** Political analysis often focuses upon the phenomenon of voting patterns by certain identifiable groups which, as history reveals, tend to vote uniformly on particular issues and for the candidates who best represent their common interests. Political strategists speak of—and attempt to mold their candidate's appeal to—"the black vote," "the Hispanic vote," "the Jewish vote" or, more recently, "the women's vote."

**6.** Pub.L. No. 97–205, 96 Stat. 131 (1982). A representative sample of the extensive legislative history may be found in S.Rep. No. 417, 97 Cong., 2d Sess. 3, reprinted in 1982 U.S.Code & Ad.News 177, 179 [hereinafter cited as Senate Report] and in H.R.Rep. No. 227, 97th Cong., 1st Sess. 3 (1981).

Operation of the statute and an analysis of its policy and legal implications are reviewed in Parker, *The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715 (1983); Blumstein, *Defining and Proving Race Discrimination: Perspectives on the Purpose vs. Results Approach from the Voting Rights Act,* 69 Va.L.Rev. 633 (1983); and *United States v. Marengo County Commission,* 731 F.2d 1546 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

**7.** Section 1 of the Fifteenth Amendment provides:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

The question that must be addressed, then, is whether Tennessee's disqualification of felons from the voting electorate impermissibly impacts on black voting strength.

### 2. *Proof of Discrimination under Section 2: The "Results" Test*

■ A violation of Section 2 is established by a showing that "in the totality of the circumstances" a particular state statute, policy, practice or standard *"results"* in the denial of equal opportunity to participate in the process for selecting persons for public office or deciding public issues. 42 U.S.C. § 1973(b).

### a. *Amendment of Section 2 Following the Bolden Decision*

■ The Voting Rights Act was amended by Congress to impose a "results" test as the standard for determining state compliance with the Act, thereby supplanting the "intent" standard articulated in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In *Bolden*, Justice Stewart, writing for a plurality,

stated that the language of original Section 2 merely elaborated the dictate of the Fifteenth Amendment and, accordingly, incorporated the discriminatory intent standard that was prescribed by the constitutional provision. In that case, a group of black Mobile residents charged that the at-large election scheme for the city commission resulted in discriminatory dilution of the black vote. Plaintiffs showed that despite the fact that thirty-five percent of Mobile's population was black, no black candidate had been elected to the three-seat city commission since its creation in 1911. The Court held that the plaintiffs were not entitled to relief since they had failed to demonstrate a purposeful, discriminatory scheme to dilute the black vote.

Community reaction to *Bolden*, generated prompt Congressional review and, ultimately, amendment of Section 2.[8] Whereas the original Section 2 mirrored the language of Section 1 of the Fifteenth Amendment, the amended Section 2 goes considerably further, mandating that a "results" test guide federal judicial review of claims brought under the Act.[9]

---

**8.** In specifying the reasons for amending Section 2, the Senate Report states:

The proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden*. In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.

In *Bolden*, a plurality of the Supreme Court broke with precedent and substantially increased the burden on plaintiffs in voting discrimination cases by requiring proof of discriminatory purpose. The Committee has concluded that this intent test places an unacceptably difficult burden on plaintiffs. It diverts the judicial inquiry from the crucial question of whether minorities have equal access to the electoral process to a historical question of individual motives.

In our view, proof of discriminatory purpose should not be a prerequisite to establishing a

violation of Section 2 of the Voting Rights Act. Therefore, the Committee has amended Section 2 to permit plaintiffs to prove violations by showing that minority voters were denied an equal chance to participate in the political process, i.e., by meeting the pre-*Bolden* results test.

*Senate Report, supra* note 6, at 15–16, U.S. Code Cong. & Admin.News 1982, pp. 192–193.

**9.** In *United States v. Marengo County Commission*, 731 F.2d at 1562, Judge Wisdom discussed the constitutional considerations underlying the Supreme Court's interpretation of the original Section 2 and the basis for the authority exercised by Congress in amending the statute to require the less stringent "results" standard.

There is no doubt that Congress amended section 2 principally because Congress was dissatisfied with the effect of *Mobile v. Bolden* on voting rights litigation. The Senate Report says so explicitly. This is to be expected; had the Supreme Court not adopted an intent requirement in *Mobile v. Bolden*, the statutory amendment would have been unnecessary. But congressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place. The amendment to section 2 does change the

b. *The "Results" Test*

██ In contrast to the *Bolden* intent standard, Section 2 "results" standard permits a finding of liability in cases where, in light of the "totality of the circumstances," the plaintiff shows that disproportionate impact is proximately related to circumstantial evidence that a particular group has been discriminatorily denied equal opportunity to participate in the political process and the selection of candidates for office.[10] The "totality of circumstances" language reflects the distinction which must be drawn between the consequences of *disadvantage* from those of *discrimination* suffered by minority groups. That is, in a democratic society certain disproportionate impact is an inevitable consequence of membership in a group numerically inferior to the majority, yet such disadvantage is not discriminatory when the disproportionate impact is attributable to the operation of racially neutral processes. As Professor James Blumstein has stated:

> [D]isproportional racial impact by itself merely highlights the existence of racial disadvantage. If society considers such disadvantage undesirable because of independent principles of distributive jus-

tice, it can use the evidence of disproportional impact as a basis for some form of relief. Such relief furthers the independent, affirmative value of improving the political influence of blacks and necessarily encompasses some notion of race-based entitlements to political influence or representation.

Blumstein, *supra* note 6, at 635.

██ Section 2 does not extend race-based political entitlements to blacks or other minorities—it does not secure the right of proportional representation[11]—instead, the provision protects what voting strength minority groups may have against unlawful dilution. To this end, disproportionate impact alone does not warrant relief, rather, it prompts judicial inquiry into attendant objective factors that may tend to reflect a discriminatory scheme to impede free access to the political process. Hence, while intent need not be shown, the ultimate conclusion that a violation has occurred must be tied to a finding that the scheme *unfairly* impacts on the minority group—not necessarily purposefully, but at least for reasons deemed more culpable than neutral.

standard that voting rights plaintiffs must meet. But those who argue that this change is tantamount to overruling *Mobile v. Bolden* miss the point of that case. That case held that direct violations of the substantive provisions of the Fourteenth and Fifteenth Amendments—that is, the provisions not amenable to statutory change—are established only when discriminatory purpose is shown. The Court also held that the Voting Rights Act, as then written, did not impose a different standard from that of the Constitution. But nothing in *Mobile v. Bolden* suggested that Congress could not prohibit by statute what the Court had declined to forbid under the Constitution. *City of Rome* [*v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) ], decided the same day, upheld legislation that prohibited discriminatory effects. It may well be that *Mobile v. Bolden* should be understood as an invitation by the Court to Congress to supplement the Constitution's fundamental, self-enforcing prohibition of purposeful discrimination. Basic to a governmental system resting on separation of powers is the power of Congress to go beyond the explicit provisions of the Constitution and to take steps that the courts are reluctant to take

in the absence of legislation. *M'Culloch v. Maryland,* 1819, 17 U.S. (4 Wheat.), 316, 4 L.Ed. 579. The rule of *Mobile v. Bolden* is not that discrimination can be prohibited only if it is purposeful. It is rather that the courts, acting without statutory guidance, will go no further than to strike down purposeful discrimination. It is for Congress to decide how much further to go in fulfilling the goals of the Constitution. Congress has done so.

**10.** As discussed in note 9, the intent standard continues to be the test for attaching liability for a violation of civil rights under either the equal protection clause of the Fourteenth Amendment or the Fifteenth Amendment. *City of Mobile v. Bolden,* 446 U.S. at 65, 100 S.Ct. at 1498; *Rogers v. Lodge,* 458 U.S. 613, 634 n. 6, 102 S.Ct. 3272, 3284 n. 6, 73 L.Ed.2d 1012, 1028 n. 6 (1982); *United States v. Dallas County Commission,* 739 F.2d 1529, 1540–41 (11th Cir.1984); *see also, infra,* pp. 813–14.

**11.** Section 2(b) expressly provides "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

The Section 2 "results" standard is tied to the analytical framework developed in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[12] In *White*, the Court held that variations in population between districts under a reapportionment plan for the Texas House of Representatives did not establish a *per se* violation of the equal protection clause of the Fourteenth Amendment. But, in striking down the plan's creation of multimember districts in certain areas of minority voting strength, the Court found that these aspects of the plan were tied to and were but continuing manifestations of "the history of official discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the political process." *Id.* 412 U.S. at 766, 93 S.Ct. at 2339. Only by consideration of the challenged plan in the context of certain objective criteria could the Court determine that the plan was tied into a historically-rooted scheme through which " 'the black community [was] effectively excluded from participation in the Democratic selection process' . . . and was generally not permitted to enter into the political process in a reliable and meaningful matter.' " *Id.* at 767, 93 S.Ct. at 2340, *quoting Graves v. Barnes*, 343 F.Supp. 704, 726–27 (W.D.Tex.1972) (district court proceedings below).

■ Similarly, in this case, proof that the disenfranchisement provision of the Tennessee Voting Rights Act results in disproportionate racial impact does not establish a *per se* violation; rather, it is only in the context of historical and social forces that a challenged practice can be determined to "result" in discriminatorily diminished access to the political process. The objective factors set forth in *White* and *Zimmer* represent indicia of historically-rooted discrimination that traditionally accompany racially-based efforts to deny

blacks effective franchise. A court's finding that the existence and/or continuation of such indicia is proximately related to the operation of the challenged state practice would warrant the conclusion that the practice "results" in the type of foreclosure of equal opportunity to exercise the right to vote proscribed under Section 2 of the Act.

The Senate Report sets forth typical *Regester/Zimmer* factors to be weighed under a court's "totality of the circumstances" results analysis. They include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

---

12. Senate Report, *supra* note 6, at 27–31.

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting or standard, practice or procedure is tenuous.

Senate Report, *supra* note 6, at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206–207 (footnotes omitted). The factors cited by the Senate are not exclusive, but are representative of the considerations a court should examine in determining whether a challenged state policy or plan is tied to historically-rooted discriminatory practices. *Chapman v. Nicholson*, 579 F.Supp. 1504, 1509 (N.D.Ala.1984) (review of the *Zimmer* factors is necessary because of their "close correlation with the ultimate issue of denial of minority access to the electoral process); *Harris v. Graddick*, 593 F.Supp. 128, 133 (M.D.Ala.1984) ("a court must engage in a searching practical evaluation of the past and present reality").

c. *The Requirement of a Causal Connection*

Although (1) the Tennessee Act disproportionately impacts on blacks and (2) the historical effects of discrimination against blacks continue to be present in Middle Tennessee, *see e.g., Taylor v. Haywood County*, 544 F.Supp. 1122, 1135 (W.D.Tenn. 1982); (granting a preliminary injunction enjoining an at-large method for selecting county highway commissioners since the procedure potentially diluted the black vote); *Geier v. Alexander*, 593 F.Supp. 1263, 1265 (M.D.Tenn.1984) (recognizing continuing effects of past discrimination as a basis for entry of consent decree desegregating Tennessee's institutions of higher education), such factors do not warrant a *conclusive* presumption that a violation of the Voting Rights Act has occurred. The underlying premise of the result test's "totality of the circumstances" analysis is that a *causal connection* must be established between the indicia of historically-rooted discrimination and the Tennessee statute disenfranchising felons.

■ In *United States v. Marengo County*, 731 F.2d 1546 (11th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984), Judge Wisdom held that upon a showing of socioeconomic or political disadvantage, the plaintiff satisfies its burden of going forward with the proof, and the burden of denying a causal nexus between the indicia of discrimination and the challenged practice lies with the defendant. *Marengo County*, 731 F.2d at 1569; *see also* Blumstein, *supra* note 6, at 658–661 (analogizing the burden on the state defendant to advance legitimate, neutral, governmental objectives to the tort theory of *res ipsa loquitur*). Thus, a finding that a state practice imposes a disproportionate impact on blacks and occurs in a social context characterized by a history of discrimination against blacks at the polls, warrants the rebuttable presumption that a violation of the Voting Rights Act has occurred.

3. *The Nondiscriminatory Tradition of State Disenfranchisement of Felons*

■ In this case, the nexus between discriminatory exclusion of blacks from the political process and disenfranchisement of felons simply cannot be drawn. Despite the presence of *Zimmer* factors in certain Tennessee communities, these facts cannot be tied to the historical tradition—and rationale—for disenfranchising felons. In *Green v. Board of Elections of City of New York*, 380 F.2d 445, 450–51 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). Judge Friendly reviewed the widespread practice by states in disenfranchising felons.

It is true that with nearly all felonies punishable by death in 18th century England, ... the voting rights of convicted felons had not been a very live issue there. But eleven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convict-

ed felons. Moreover, twenty-nine states had such provisions when the Fourteenth Amendment was adopted, and the total has now risen to forty-two.

Disenfranchising the felon never has been attributed to discriminatory exclusion of racial minorities from the polls.

The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime.

*Id.* at 451. In sum, law-abiding Tennesseans—black or white—possess no legitimate expectation, nor any great desire for participation by felons in the resolution of issues important enough to be put before the electorate.

Although the plaintiffs present interesting statistics purporting to chart the inevitable, progressive decline in the black population entitled to vote,[13] the operation of the challenged provision of the Tennessee Voting Rights Act does not deny any citizen, *ab initio*, the equal opportunity to participate in the political process and to elect candidates of their choice. Rather, it is the commission of preascertained, proscribed acts that warrant the state to extinguish certain individuals' rights to exercise their opportunity to participate.

■ Felons are not disenfranchised based on any immutable characteristic, such as race, but on their conscious decision to commit an act for which they assume the risks of detection and punishment. The law presumes that all men know its sanctions. Accordingly, the performance of a felonious act carries with it the perpetrator's decision to risk disenfranchisement in pursuit of the fruits of his misdeed.

The exercise of state sovereignty to disenfranchise felons is no more objectionable than a state's decision to withhold the right of suffrage from all those who have not yet reached the age of 18. The Twenty-Sixth Amendment prohibits the United States or any state from denying or abridging the right to vote to any citizen who has reached the age of eighteen. This does not preclude, however, a state from extending the right to vote to persons younger than eighteen. Were this Court to rule that Tennessee's disenfranchisement of felons violated the federal Voting Rights Act, in light of the disproportionately higher percentage of blacks under eighteen as compared to whites, it would follow that Tennessee's limitation of the franchise to persons of at least eighteen years of age also unlawfully dilutes the black vote. Yet, no violation occurs under either situation, since neither state limitation bears the taint of historically-rooted racial discrimination. *See* Blumstein, *supra* note 6, at 701–02. The disproportionate impact does not "result" from a state qualification to voting based on race.

### D. *Disenfranchisement of Felons Does Not Unlawfully Dilute the Black Vote*

---

**13.** Plaintiffs pose a hypothetical of Malthusian proportion which purports to reflect the progressive dilution of the black vote. When extropolated over a period of 50 years, plaintiffs claim that enforcement of the Tennessee Voting Rights Act would result in the disenfranchisement of one-half of Tennessee's blacks.

*Under the Fourteenth or Fifteenth Amendments.*

■ The recent decision in *Escambia County v. McMillan,* — U.S. ——, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984), counsels this Court to also make a dispositive ruling on the plaintiffs' constitutional claims under the Fourteenth and Fifteenth Amendments. In light of the fact that the plaintiffs cannot, as a matter of law, prevail under the less stringent "results" standard of Section 2, it seems axiomatic that plaintiffs similarly fail under the "intent" standard for their constitutional claims. *Lee County Branch of the NAACP v. City of Opelika,* 748 F.2d 1473, 1478 and n. 7 (11th Cir.1984) (Wisdom, J.). However, a separate determination is necessary on the constitutional claims because although the *Zimmer* criteria have force in determining whether discriminatory purpose underlies the Tennessee provision, the *Zimmer* factors are entitled to differing weight under the constitutional standard. *See id.* at 1479–80. Despite the different standard, the Court holds that no violation of constitutional rights occurs under the Fourteenth and Fifteenth Amendments (incorporating the analysis contained in parts B and C of this opinion). The claims are dismissed.

## Conclusion

The Court holds that provisions of Tennessee Voting Rights Act disenfranchising felons do not conflict, and are consistent with the Fourteenth and Fifteenth Amendments and Section 2 of the federal Voting Rights Act. The plaintiffs' complaint is dismissed for failure to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6).